429 A.2d 1331 (1981)
In the Matter of: B. K., Appellant.
No. 80-252.
District of Columbia Court of Appeals.
Argued February 19, 1981.
Decided March 11, 1981.[*]
Melvin A. Marshall, Washington, D.C., for appellant.
Richard B. Nettler, Asst. Corporation Counsel, Washington, D.C., with whom Judith W. Rogers, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, Washington, D.C., were on the brief, for appellee. David P. Sutton, Asst. Corporation Counsel, Washington, D.C., also entered an appearance for appellee.
Before KELLY, FERREN and PRYOR, Associate Judges.
PER CURIAM:
The District of Columbia has the authority pursuant to D.C.Code 1973, §§ 16-2301, -2320, to protect a "neglected child" by removing that child from the custody of his or her parents. In this appeal, the father of a child found to be "neglected" challenges both the finding below and the constitutionality of the D.C. Statute. We deem appellant's arguments to be without merit and therefore affirm.

I
The young girl, B.K., whose present and future well-being is the central concern of this proceeding, was born on September 19, 1978, at the Georgetown University Hospital. Both her parents have been diagnosed as suffering from undifferentiated paranoid schizophrenia. Although appellant argues that the court below incorrectly focused on the parents' mental illness rather than the well-being of the child, it is clear from the record that the parents' condition was considered relevant only insofar as it pertained to their ability to provide proper care for B.K. The evidence showed that they were unable to do so, and that when in their care, B.K.'s physical and emotional health was threatened.
*1332 During the period while she was in the hospital delivering her baby, B.K.'s mother exhibited strange behavior which prompted further examination by staff psychiatrists. The mother's condition was diagnosed as a "classic case of schizophrenia" and the prediction was that she would be unable to comprehend her child's emotional and physical needs. Although the Child Protective Services Division of the Department of Human Resources was apprised of the situation by doctors at Georgetown, there was no direct intervention by the Division at that time. On February 16, 1979, the Child Protective Services Division was again contacted about this unfortunate situation when the father of B.K.'s mother informed the Division that his daughter and appellant had been arrested while standing in the middle of the street, apparently under the influence of drugs. The events which finally caused intervention by the Protective Services Division began on March 23, 1979, when pedestrians observed appellant and B.K.'s mother, with B.K. in a stroller, walking downtown at about 11:00 p. m. According to the pedestrians, appellant and B.K.'s mother appeared to be disoriented and intoxicated, and B.K. was screaming. This alarmed the pedestrians who approached the couple. At that point, B.K.'s mother walked away and, after arguing with the pedestrians, appellant also left. The pedestrians, then took B.K., who was clad only in a thin cloth pajama, into the Embassy Row Hotel where they called the police. After police arrived on the scene, B.K.'s mother appeared at the hotel. Since she appeared to be intoxicated, the officers transported her to the detoxification unit of the D.C. General Hospital. Meanwhile, B.K. was taken into custody by the Youth Division of the Metropolitan Police Department.
That night, a police officer and an investigator for the Protective Services Division visited the Kalorama Road house where appellant lived with B.K. and B.K.'s mother. According to their testimony, and the testimony of an inspector for the Housing and Community Development Department who inspected the house on March 27, 1979, the premises were, to put it mildly, not very pleasant. There was plaster falling from holes in the ceiling, cracks in the walls, no adequate kitchen facilities, dirty pampers strewn all over the floor, profuse odors, human and animal feces on the first and second floors, broken windows in the bathroom and, due to a structural defect, water was leaking on exposed wiring. According to the housing inspector, these conditions were dangerous and constituted a health hazard.
When he was visited on the night of March 23, 1979, by the police officer and the housing inspector, appellant agreed to permit the Child Protective Services Division to provide emergency care for B.K. However, on March 27, 1979, B.K. was released into the custody of her mother, who at that time expressed her willingness to cooperate with Protective Services. Only a few days later, during the evening of April 3, 1979, B.K. was again taken into protective custody. Customers and employees in a restaurant had observed B.K.'s mother, seated at a table, swinging B.K. through the air. With each swing, B.K.'s head came perilously close to colliding with the table top. The acting manager of the restaurant, after talking to B.K.'s mother, became concerned for the safety of the child and called the police. All the while, appellant was seated at the bar, apparently oblivious to the situation. When the police arrived, B.K. and her mother were taken into custody. B.K. was placed in shelter care at St. Ann's Infant Home.
At this point, the Protective Services Division began a more thorough investigation of the circumstances surrounding B.K.'s care and both parents underwent physical and mental examinations. On April 10, 1979, a petition was filed in Superior Court alleging that B.K. was a "neglected child" under D.C.Code 1973, § 16-2301(9)(B) & (C).[1]
*1333 A lengthy factfinding hearing was conducted in the Superior Court Family Division beginning on October 15, 1979. Extensive testimony was heard from case workers and psychiatrists regarding B.K. and her parents. Appellant's landlady and a Catholic priest testified on behalf of B.K.'s parents. At the conclusion of the evidence, the court issued its findings of fact and ruled that the government had shown, by a preponderance of the evidence, that B.K. was neglected within the meaning of the statute. A dispositional hearing, pursuant to D.C.Code 1978 Supp., § 16-2320(a)(2) and (3), was held on December 18, 1979, and B.K. was placed in the custody of her maternal grandparents.

II
We emphasize at the outset that the order below does not terminate parental rights but merely determines custody of the neglected child for a period of two years, at which time further proceedings must be held. See In re: H.M., D.C.App., 386 A.2d 707 (1978).
The trial court correctly stated that in a neglect proceeding the government must prove its case by a "preponderance of the evidence." This is clear from the statute itself. D.C.Code 1973, § 16-2317(c)(2).[2] Appellant, however, argues that because the ruling below separated him from his child, and thus threatens the sanctity of his family, see Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1979), the Constitution requires that the standard of proof be "clear and convincing evidence." In In re: J.S.R., D.C.App., 374 A.2d 860 (1977), we stated that the consequences of a finding that parental consent to an adoption was being withheld contrary to the best interests of the child are "far more severe than those of a finding of neglect." Id. at 864. Nonetheless, we held that, although the higher standard of "clear and convincing evidence" was warranted in the adoption case, it was not constitutionally required. Therefore, it follows that in a neglect proceeding the Constitution does not require the "clear and convincing evidence" standard.
Our holding In re: J.S.R. is not altered by Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), in which the Supreme Court held that due process requires the "clear and convincing" standard of proof in a civil proceeding brought to commit an individual involuntarily for an indefinite period of time to a state mental hospital. The individual's liberty interest at stake in Addington is greater than appellant's interest in retaining custody of his child, particularly when balanced against the interest of the state in protecting neglected children.
On the basis of the record in this case, we are satisfied the child was shown to be neglected by a preponderance of the evidence. We note also that the trial court stated in its findings that even under the "clear and convincing" standard the government had made its case. That exemplifies both the solicitousness of the trial court for the interests involved and the great weight of the evidence presented by the government.

III
Appellant also challenges the constitutionality of the neglect statute pursuant to which the petition was brought. We cannot *1334 quarrel with appellant's assertion that the state must tread carefully when it intrudes upon the integrity of the family unit. See Moore v. City of East Cleveland, supra; Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). This court recognized that fundamental proposition in In re: J.S.R.:
The right of a natural parent to raise one's child is a fundamental and essential one which is constitutionally protected. However, it is not an absolute one. The state has both the right and the duty to protect minor children through judicial determinations of their interest. To this end, the state has a substantial range of authority to protect the welfare of a child, and the state's legitimate interest in the child's welfare may be implemented by separating the child from the parent. [Supra at 863 (citations omitted).]
Appellant contends the statutory definition of a "neglected" child is vague, and therefore unconstitutional. In order to withstand a vagueness challenge the statute must state its standard with adequate clarity and make sufficiently distinct boundaries for the law to be fairly administered. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The Supreme Court has reminded us that in considering vagueness, statutes which do not involve First Amendment freedoms must be evaluated in light of the facts of the case at hand. United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); see In re: A.B., Jr., D.C.App., 395 A.2d 59, 61 (1978). The statute in question here may be broad in its coverage, but we are not persuaded that it is vague. We point out that "proceedings under this type statute demand and provide a certain amount of elasticity to the court." Matter of C.M.S., 609 P.2d 240, 244 (Mont.1979). The statute requires an investigation into the circumstances of the particular case and provides clear guidelines for determining whether a child is neglected. On the facts of this case, there is no question that such a finding was proper.
Affirmed.
NOTES
[*] The original disposition of this case was by an unpublished Memorandum Opinion and Judgment. The motions for publication were granted.
[1] The term "neglected child" means a child 

* * * * * *
(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his parent, guardian, or other custodian;
(C) whose parent, guardian, or other custodian is unable to discharge his responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; ... [D.C.Code 1973, § 16-2301(9)(B) & (C).]
[2] The pertinent section reads:

(c) If the Division finds in a factfinding hearing that
* * * * * *
(2) the allegations in a need of supervision or neglect petition have been established by the preponderance of the evidence,
the Division, after giving the notice required by subsection (e) of this section, shall proceed to hold a dispositional hearing....