### VI

### CONCLUSION

For the foregoing reasons, the judgments appealed from must be and each is hereby

*Affirmed.*

## In re S.K. and V.L., Appellants.

### No. 87–1063.

District of Columbia Court of Appeals.

Argued Feb. 9, 1989.

Decided Oct. 13, 1989.

Karen M. Stram, Washington, D.C., appointed by the court, for appellant V.L.

Charles A. Moran, Washington, D.C., appointed by the court, for appellant S.K.

Mary L. Wilson, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

PER CURIAM:

■ This is an appeal by a mother and her eight-year-old child from a finding by the trial judge that the mother had abused and neglected her child under D.C.Code § 16–2301(9)(A) (1981). The judge based his finding of neglect on the fact that the mother had beaten the child with a belt notwithstanding her knowledge of the child's severe psychological problems when the child had denied setting fire to her bed. Appellants contend that the key findings of fact are unsupported by the record, and that the judge failed to consider the mother's mitigating actions and shifted the burden of proof by relying on a statutory inference of neglect under D.C.Code § 16–2316(c) (1981). The government must prove by a preponderance of the evidence that a child is abused. *See In re B.K.*, 429 A.2d 1331, 1333 (D.C.1981); *see also In re J.S.R.*, 374 A.2d 860, at 864 (D.C.1977) (pre-

ter a conscientious inquiry that they had in fact been served and filed. We discern no error in that determination.

ponderance standard is "a comparative one requiring the court to merely determine who has the most competent evidence").[1] All parties agree, as do we, that the judge must apply an objective standard in determining whether the parental action constitutes abuse. On that basis, the judge found that S.K. was an abused child because a reasonable person, knowing of S.K.'s severe mental problems, would have restrained his or her reaction in responding to an admittedly potentially life-threatening circumstance. We concur in all except Part IV and footnote 10 of Judge Schwelb's opinion, concluding that the evidence on which the trial judge relied supports his findings.

Dr. Vernberg testified about S.K.'s mental condition and opined that the reaction of the mother and the stepfather in beating S.K. for starting the fire was inappropriate. The mother admitted that she was aware of S.K.'s severe mental problems and still had beaten her with a belt when S.K. denied her culpability and stared blankly into space. When S.K. was admitted to the psychiatric ward of Children's Hospital several welts were visible on her body, and one was still visible a week and one-half later. Under these circumstances we hold that there was sufficient evidence for the judge to find that the corporal punishment of S.K. by the mother was excessive, and consequently, that S.K. was a neglected child as a result of abuse.

That the record also contains evidence that is, arguably, supportive of the mother's viewpoint of what happened is not dispositive. The trial judge was in the best position to evaluate the mother's and S.K.'s credibility. In finding abuse, the judge could properly emphasize the mother's knowledge of S.K.'s severe mental problems in view of the assessment by hospital

officials that the mother, although able to present herself well, lacked appropriate appreciation of the effect of her treatment of S.K. and was unwilling to acknowledge its consequence.

In addition, we disagree with appellants' contention that the trial judge made four critical findings of fact that require reversal. First, they claim there was no evidence that the mother acted in a rage. Regardless of whether we agree with appellants that this was a critical finding, there was evidence from which the judge could make such a reasonable inference. Although the mother realized S.K. was acting inappropriately, she repeatedly beat her with a belt and admitted to Dr. Vernberg that she was afraid that she would not have been able to control herself if she had not stopped to seek assistance.

Appellants' second contention, that there was no evidence the beatings resulted in abrasions, is meritless in view of evidence of welts on S.K.'s body, at least one of which was still visible when the police investigated on July 25, more than a week after the beatings. Their third contention, that there was no evidence to support the judge's finding the mother, knowing of S.K.'s emotional problems, should have acted differently, also is meritless. Again, there was Dr. Vernberg's testimony on which the judge was entitled to rely in applying an objective standard. Finally, appellants' contention that there was no evidence that such physical discipline was likely to exacerbate S.K.'s condition ignores the expert testimony about the nature of S.K.'s mental condition, its causes, the inappropriateness of such behavior, and the effect of the beatings. Therefore, the evidence was sufficient to support the trial judge's finding that beatings were likely to exacerbate S.K.'s fear of her mother and cause her to withdraw and to experience hallucinations and death wishes.

1. The judge needlessly relied upon D.C.Code § 16–2316(c), which creates a permissive inference of neglect based on mental or physical injuries of a child which are not satisfactorily explained. The circumstances surrounding S.K.'s injuries were not in question; the mother admitted that she and the stepfather were responsible for inflicting the July 13 welts and bruises. Cf. In re L.E.J., 465 A.2d 374 at 376–77 (D.C.1983) (mother never provided consistent or credible account of how five-week-old son incurred fractures of both arms where medical testimony indicated such injuries were unusual in children of this age).

Contrary to appellants' contention, the trial judge's use of § 16–2316(c) did not shift the burden of proof. The judge noted specifically that the inference was not the same as a judgment based on a finding of neglect.

Accordingly, declining to exercise our jurisdiction to decide the vagueness challenge, we affirm the judgment.[2]

SCHWELB, Associate Judge (concurring in part and dissenting in part): I agree with my colleagues that there was evidence before the trial judge from which he could have found facts which would constitute child abuse within the meaning of D.C.Code § 16–2301(9)(A) (1981).[1] I do not believe, however, that the facts actually found by the judge were sufficient to sustain the government's burden of persuasion. Accordingly, although my colleagues and I are in agreement as to substantially all of the legal principles which govern this case, I cannot join in the affirmance of the judgment. Rather, I would vacate the finding of abuse and remand for further proceedings.

## I

## HISTORY OF THE CASE

On July 13, 1986, S.K., who was then eight years old, set her bed on fire. Her

mother and stepfather, who were asleep at the time, awoke to the smell of smoke. S.K. initially denied knowing anything about the fire and pretended to help her parents look for its origin. She eventually admitted that she was responsible.

After the mother and stepfather had put out the fire, the mother struck S.K. approximately twice[2] with a belt. S.K. acted strangely, staring into space, and the mother ran out to telephone for help. While the mother was doing so, the stepfather administered another whipping. S.K. had several welts on her body, apparently as a result of these beatings. Concerned about S.K.'s behavior and emotional condition, the mother took her to Children's Hospital. S.K.'s welts did not require medical treatment, but she was admitted to the psychiatric ward.

Children's Hospital authorities immediately referred the case to the Child Abuse unit of the Metropolitan Police Department's Youth Division. After a somewhat perfunctory inquiry, a police detective concluded that there was no need for police

---

**2.** Appellants contend that D.C.Code § 16–2301(9)(A) is unconstitutionally vague because the term "abused" is inadequately defined and that the use of an objective standard is inadequate to save the statute because there is no general consensus on when discipline of a child becomes abuse. *See generally Taylor v. Montgomery,* 413 A.2d 923, 925 (D.C.1980) (due process). Since appellants raise their constitutional challenge to the neglect statute for the first time on appeal, our review is entirely discretionary. *In re W.E.P.,* 318 A.2d 286, 289 (D.C.1974); *Foster v. United States,* 290 A.2d 176, 177 (D.C.1972). Ordinarily, the court has declined to exercise its discretion to consider constitutional challenges raised for the first time on appeal unless "the statute is so clearly unconstitutional that it should have been ruled upon by the trial court despite the failure of appellant to raise the point below...." *In re W.E.P.,* 318 A.2d 286, at 289 (D.C.1974) (quoting *Williams v. United States,* 237 A.2d 539, 540 (D.C.1968)). We find no such circumstances nor any other reason compelling our review.

The statute prohibits excessive corporal punishment and the conduct on which the trial judge based his finding of abuse—repeatedly beating with a belt a psychologically disturbed eight-year old who is acting strangely—clearly falls within the express terms prescribed by the statute. *Cf. District of Columbia v. B.J.R.,* 332

A.2d 58, 60 (D.C.), *cert. denied,* 421 U.S. 1016, 95 S.Ct. 2425, 44 L.Ed.2d 685 (1975) (D.C.Code § 16–2301(8) (1981)). *See also In re B.K., supra,* 429 A.2d at 1334 (D.C.Code § 16–2301(9)(B) & (C)); *Robinson v. United States,* 317 A.2d 508, 510 & n. 2 (D.C.1974) (assault with a dangerous weapon). Other jurisdictions have uniformly upheld that their child neglect and abuse statutes against a vagueness challenge even when the statutory language was more general than § 16–2301(9)(A) and (23).

**1.** Section 16–2301(9)(A) provides:
(9) The term "neglected child" means a child:
(A) who has been abandoned or abused by his or her parent, guardian, or other custodian;
Section 16–2301(23) defines "abused" as follows:
(23) The term "abused", when used with reference to a child, means a child whose parent, guardian, or custodian inflicts or fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child, including excessive corporal punishment or an act of sexual abuse, molestation, or exploitation.

**2.** The mother could not remember exactly how often or on what parts of S.K.'s body she administered the blows.

intervention. Children's Hospital then requested a "hold" to prevent S.K.'s removal from the hospital, but the police again found insufficient evidence of abuse. Finally, a hold was placed on the child at the hospital's request; the mother learned about it when she was not permitted to take S.K. to the cafeteria.

On July 28, 1986, more than two weeks after the beating, the Hospital's Associate Director of Inpatient Psychiatric Services and the psychiatric social worker assigned to the case directed a letter to the Chief of Intake of Child and Family Services which began as follows:

> We are writing to strongly request that [S.K.] be immediately removed from her parents' care and placed in the custody of the Department of Human Services. We believe this child is in imminent danger of continued physical and emotional abuse and that this should be regarded as an emergency situation.
>
> [S.K.] has sustained documented physical and sexual abuse at the hands of family members since 1978 when she was an infant. She is now eight years old. Two other children in the home died in unusual circumstances. We feel that the system has largely closed its eyes to this child's pleas for help and has taken no effective action to stop this abuse despite a lengthy history of violence in the home

and repeated reports of abuse by medical personnel and others.

After describing both the incident that precipitated S.K.'s hospitalization and her prior history of mistreatment, which ranged from the melancholy [3] to the unspeakable,[4] the letter concluded as follows:

> In summary, we implore you to act swiftly to remove this child from her family. How much more abuse can her frail body withstand? How much more pain can her frail psyche endure?

On July 29, 1986, the Corporation Counsel filed a petition alleging not only that S.K. had been beaten by her mother and stepfather, but also that

> this family has a history of child abuse contacts and two of said child's siblings have died under questionable circumstances.

On the same day, a hearing was held before Judge Steffen Graae. Judge Graae found probable cause to believe that S.K. was a neglected child and ordered that she be placed in shelter care pending trial, with supervised visitation rights for the mother and stepfather. Pursuant to Judge Graae's order, S.K. was placed at St. Ann's Infant Home, where she remained for more than a year.

While the case was awaiting trial, the government struck from its petition the allusion to the deaths of S.K.'s siblings. In fact, the government apparently agreed to

---

**3.** *E.g.*, during her 1986 admission, S.K. expressed fear of being struck on the head with a hammer and of being compelled to drink bleach. She had been brought to Children's Hospital on several prior occasions after poisoning was suspected. She indicated in 1986 that unlawful drugs and alcohol were used in her home.

At the age of 3½, S.K. was admitted to the hospital unconscious, apparently as a result of abdominal trauma. When she was seven, an anonymous caller reported frequent screaming from her apartment.

**4.** The letter from Children's Hospital also contains the following:

On 10/17/78 when [S.K.] was 6 months old she was brought to the CHNMC Emergency Room, examined by the Child Protection Center team physician who found "a torn perineum, inflammation of the vaginal opening, scratches, bruised buttocks, and human bite

marks on her feet." Her biological father admitted to inflicting some of the injuries "in play." The mother maintained there was no sexual abuse and no trauma and that these injuries were present since birth. The Washington Hospital Center birth records were checked and indicated no such injuries at birth. Evidence of sexual abuse was clear.

\* \* \* \* \* \*

[L.L.], also [S.K.'s] full brother, died 11/25/81 one month after the death of [K.L.], [another brother]. Our CPC records stated, "Medical Examiner says death was due to bilateral brain hemorrhage. There were no external bruises but age of hematoma suggests trauma on Monday.... At present the mother states that both she and [L.L.] were beaten by [the] father of her children, and that she believes [L.L.] died because of a head injury inflicted upon by him by his father." One subject of S.K.'s hallucinations was imagined contact with one of her dead brothers.

go further and to eliminate the allegations of the family's past history as well. Judge Truman Morrison "indicated displeasure" with this plan, however, and the "history of child abuse" allegation remained in the petition, albeit almost ornamentally.

Following several continuances, the case was brought to trial before Judge Ricardo Urbina on April 27, 1987. After hearing the evidence, the judge found S.K. to be a neglected child and ordered that she be continued in shelter care pending disposition. On August 24, 1987, the judge ordered that S.K. be returned to the care of her mother and placed for one year under the protective supervision of the court.[5] S.K. and V.L. both appeal, contending principally that the District's neglect statute is unconstitutionally vague, that the evidence was insufficient to show neglect, that the trial judge improperly shifted the burden of proof, and that several specific factual findings were erroneous. Finding appellants' other arguments unpersuasive,[6] I address in detail only their contention that the mother's conduct of July 13, 1986 did not constitute child abuse.

## II

## THE EVIDENCE AND THE JUDGE'S RULING

At the beginning of the trial, Judge Urbina announced, restating a prior ruling, that the scope of the relevant evidence would be limited so that "the events immediately leading up to the July 1986 alleged incident would be the focus of the government's case." He subsequently held that evidence of earlier incidents would be admitted only if

they shed some light on the state of mind that is compatible with [what] you allege led into the events of July '86. If not, they're excluded.[7]

This meant, in effect, that the mother and stepfather were basically to be tried for beating S.K. with a belt on July 13, 1986, and that other incidents of abuse were to be considered only if they qualified under the kind of analysis under which evidence of "other crimes" is admitted in criminal cases, e.g. to show intent, motive, or lack of accident. See generally Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). This conception of the issue before the court, which was not opposed by the government, shaped the evidence which the judge heard and formed the basis for his decision.

At trial, Dr. Douglas Tebor, who conducted an emergency psychiatric evaluation of S.K. at Children's Hospital, was qualified as an expert in psychiatry. He testified that when she was brought to the hospital, S.K. was quiet, sad and withdrawn. He noticed some redness on her body, three or four welts on the upper thigh of the left leg, and several red welts on her upper left arm. The welts were approximately three to four inches in

---

**5.** In the absence of any supervening event which would require otherwise, the protective supervision order was to expire by its terms on August 24, 1988. We have not been apprised whether the case is still open, but no party has raised any issue of mootness. I assume without deciding that any adjudication of child abuse has collateral consequences. Cf. Gethers v. United States, 556 A.2d 201, 206 n. 7 (D.C.1989).

**6.** For reasons described at pp. 16–17 and n. 10, infra, I disagree with appellants' claim in this court that the neglect statute is unconstitutionally vague. I do not think any of the judge's evidentiary findings were clearly erroneous. I question, as do appellants, whether D.C.Code § 16–2316(c), which permits the court to infer neglect where the child has suffered injuries which have not been satisfactorily explained, applies to a situation where, as here, the origin of the injuries is essentially undisputed. I am satisfied, however, that if the judge considered this provision at all—and it is not mentioned in his written findings—he did not improperly utilize it to shift the burden of persuasion to the mother.

**7.** At a later stage of the trial, the judge commented, following the cross-examination by the mother's counsel of a government witness, that

if the government has any evidence that it wishes to present that it seeks to establish that the child has been beaten before, any physical evidence of physical beating, that door has been opened and ... the evidence is admissible.

The judge explained that he was referring only to beatings by the mother or stepfather. It appears that the government was thereafter unable to adduce any admissible evidence of earlier incidents.

length. S.K. initially denied setting the fire and said she was not going to say anything because she was afraid she would be whipped.[8] She later told Dr. Tebor that she had auditory hallucinations, disturbed sleep, and violent thoughts about hurting her peers. Dr. Tebor also interviewed the mother, whom he found to be upset and overwhelmed. He testified that the mother told him that she was afraid that if she had not taken S.K. to the hospital, she might not have been able to stop hitting her. In Dr. Tebor's opinion, whipping a child for setting a fire was inappropriate.

Eric Vernberg, a clinical psychology intern, was S.K.'s case manager at Children's Hospital and her outpatient therapist after her discharge. He testified that S.K. told him that she had set her bed on fire because she wished she was dead and because she thought that the fire would kill her. She told him, almost cheerfully, that she would consider using a knife to kill herself. She reported "seeing" her dead brother frequently. She claimed that her mother beat her about three times a week, but had promised not to beat her any more. Vernberg also testified that the mother had stated that the hospital's proposed behavior management program would not work with S.K. and that the only thing you could do with the child was to beat her.

Lorraine Lougee, a psychiatric social worker from Children's Hospital, who was one of the persons who had signed the letter of July 28, 1986, testified that the mother had said she thought S.K. "needs the belt daily," and had ridiculed alternative ways to discipline S.K. Although, in Ms. Lougee's view, the mother genuinely wanted to help S.K., she tended to minimize how often she beat S.K. and was not open to exploring alternatives to whipping. Ms. Lougee was not asked any questions about S.K.'s prior history of abuse.

Testifying in her own behalf, the mother confirmed that S.K. had serious psychological problems. She related that she had observed S.K.'s behavior deteriorate over the past year. Specifically, S.K. did not do her school work. She was disobedient at home. She frequently lied. Although she generally had a poor appetite, S.K. sometimes stuffed herself to the point of vomiting. She complained of headaches and told of hearing imaginary voices. The mother testified that in the spring of 1986 she had called Children's Hospital's Psychiatric Ward for an appointment for S.K., but was told that no appointment was available until July.

The mother admitted having beaten S.K. with a belt on July 13. She also acknowledged that on past occasions she had struck her with a belt and on the hand with a ruler, but denied making the damaging statements which the government witnesses had attributed to her. She explained that on July 13, she had taken S.K. to the hospital because she was upset and afraid, not about S.K.'s bruises, but because S.K. had set the fire. In response to questioning by the trial judge, the mother testified that she did not know at the time whether or not she should discipline S.K. for setting the fire. She said she knew it was not normal for children to set fires, and that it was for this reason that she had secured medical help for S.K. She testified that she visited S.K. in the hospital daily and that "I let [her] know I love her." She stated that S.K. was easily led, and that this might explain her statements to hospital personnel to the effect that she was often beaten and afraid of further beatings.

In announcing his oral decision at the conclusion of the trial, and again in written findings dated September 3, 1987, the judge focused entirely on the July 13 incident. Although the judge made a number of comments about credibility, some of them favorable to the mother, he never made a finding, explicit or implicit, as to whether the mother had made the more damaging comments and admissions attributed to her by the government witnesses.

**8.** The government did not call S.K. as a witness because her doctors had advised that the trauma and anxiety of testifying would disrupt her therapy. Several other witnesses described the course of the investigation, and I have summarized here only that portion of the testimony which I consider important for the disposition of the case.

Rather, he eschewed any determination as to whether the mother's (or stepfather's) habitual conduct towards S.K. was abusive, and elected to decide the case on the basis of the single incident that precipitated it. The judge concluded that, while it was not abuse *per se* to whip a youngster who had started a dangerous fire, the mother should have exercised greater restraint in light of her knowledge of her daughter's emotional condition, and that her failure to do so constituted neglect. The judge expressly found that the mother acted reasonably after the beating in taking the child to the hospital but, in the light of his analysis, this evidently made no difference.

Judge Urbina also held that

the stepfather's conduct was equally insensitive, but not enough evidence was generated during the trial regarding his awareness of the child's background to permit the court to reach the conclusion that he too is guilty of what the statute contemplates as neglect.

Essentially, the judge, focusing on the culpability of the parents' behavior on a single occasion, rather than on the effect of their overall conduct on the child, "convicted" the mother and "acquitted" the stepfather of child abuse.

### III

### LEGAL ANALYSIS

When a child is battered by a parent, the state can address the problem in two different ways. The parent may be criminally prosecuted for cruelty to children. *See* D.C.Code § 22–2901 (1981); *Carson v. United States*, 556 A.2d 1076 (D.C.1989). Alternatively, or in addition, the appropriate governmental authority may institute a civil action alleging neglect or abuse under remedial legislation designed to protect the welfare of the child. D.C.Code §§ 16–2301(9), 16–2305, 16–2320. These two types of proceedings may be triggered by the same kind of conduct, but they are profoundly different in purpose and character. If the distinction between the two is blurred, the results can be unfortunate.

In a criminal proceeding, the focus is, as it must be, on the alleged wrongdoer. The child is, at most, a witness or a victim. The accused enjoys all of the rights accorded by our Constitution and laws to a criminal defendant. Proof of guilt must be beyond a reasonable doubt. The statute under which the alleged abuser is charged must sufficiently apprise him or her of what conduct is prohibited. *United States v. Petrillo*, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947). If that statute is ambiguous, it is strictly construed, for the rule of lenity applies. *Browner v. United States*, 549 A.2d 1107, 1116 n. 19 (D.C.1988). The case centers on the specific acts of cruelty alleged, and evidence of other bad acts is excluded unless it bears on a legitimate disputed issue such as intent, motive, or lack of accident; even then, such evidence is admitted only if it is found to be more probative than prejudicial. *See Drew, supra; Thompson v. United States*, 546 A.2d 414 (D.C.1988).

A civil proceeding predicated on child neglect or abuse, on the other hand, is remedial in character. Its focus is, or should be, on the child.[9] The purpose of the state's intervention as *parens patriae* is to promote the child's best interest, which is paramount. *In re Lem*, 164 A.2d 345, 348 (D.C.1960); *Petition of Dep't of Pub. Welfare*, 376 Mass. 252, 263, 381 N.E.2d 565, 572 (1978). Civil neglect statutes are designed to enable the state to identify and protect children who are in need of assistance; they are remedial and should be liberally construed. *In re N.H.*, 135 Vt. 230, 234, 373 A.2d 851, 855 (1977). The "void for vagueness" doctrine has substantially less application, for the Supreme Court has expressed "a greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."

9. *See, generally*, Wald, *State Intervention On Behalf Of Neglected Children: A Search For Realistic Standards*, 27 STANFORD L.REV. 988 (1975) (hereinafter Wald), in which the author criticizes some courts for their preoccupation with the fault of the parent and their failure to consider sufficiently the party on whose behalf the neglect machinery was created, namely the child.

*Hoffman Estates v. Flipside*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982); *see also Levas & Levas v. Village of Antioch, Ill.*, 684 F.2d 446, 452 (7th Cir.1982); *Horn v. Burns & Roe*, 536 F.2d 251, 254–55 (8th Cir.1976) ("absence of criminal sanctions requires less literal exactitude to comport with due process").[10] Abuse or neglect need not be proved beyond a reasonable doubt, as in a criminal case; a preponderance of the evidence is sufficient. *In re B.K.*, 429 A.2d 1331, 1333 (D.C.1981).

Since a civil proceeding is designed to protect the child rather than to punish the offender, it is essential that the court avoid an unduly narrow focus. One cannot determine whether a child's welfare requires the intervention of the state, with all of the disruption which such intervention often entails, by simply examining the most recent episode. Rather, the judge must be apprised of the entire mosaic.

Frequently, as in this case, the incident that precipitated the institution of the proceeding was not an isolated one, but rather a part of an alleged pattern of mistreatment. Where this is so, I do not believe that the government can adequately carry out its obligations as *parens patriae*, or that the judge can make an informed determination as to the best interests of the child, if the inquiry is restricted to the single whipping or other similar event which brought the parties to the attention of the court. To do the right thing by the child, the judge must know as much as reasonably possible about his or her situation. To resort to an imperfect but revealing analogy, the investigation must go beyond the straw that broke the camel's back, and the judge should assess the entire burden which the child has had to bear.

The present case was presented and tried more like a quasi-criminal proceeding, focusing on the guilt or innocence of the mother and stepfather in connection with the events of a particular day, than like a remedial action designed to determine if state intervention was warranted to protect the safety and welfare of the child. As a result, what might well have been a very powerful case if the trial judge had utilized a broader approach and considered the poignant history of S.K.'s troubles became, at best, a marginal one in terms of the limited evidence presented to the court, and the trial judge's findings were based on only a part of the evidence presented.

## IV

In the present case, there would be ample evidence to sustain a finding of abuse if any significant portion of the events predating July 13, 1986, which are described in the Children's Hospital submission had been found by the judge to have occurred. Besides that submission, there was evidence that the mother had in fact regularly and inappropriately beaten the child, and that she had made the statements attributed to her by the government witnesses (but denied by her) to the effect that regular beatings were the only way to deal with her daughter. The apparent deterioration of S.K.'s psychological condition, including her matter-of-fact discussion of suicide, her violent thoughts about hurting peers, her burning of the mattress, and other events described by Dr. Tebor and Dr. Vernberg,

---

**10.** Given this less exacting standard, I find wholly unpersuasive appellants' argument, made for the first time on appeal, that our neglect statute is unconstitutionally vague. *See In re B.K.*, 429 A.2d 1331, 1334 (D.C.1981); *State v. Sinica*, 372 N.W.2d 445, 448 (Neb.1985); *State ex rel. Health & Serv. Dep't v. Natural Father*, 93 N.M. 222, 225–26, 598 P.2d 1182, 1185–86 (1979). As Justice Holmes pointedly observed for the Court more than three quarters of a century ago in sustaining the constitutionality of a broadly phrased criminal statute proscribing restraints of trade,

the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or short imprisonment, as here; he may incur the penalty of death.

*Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913). Although appellants' failure to raise the constitutional issue in the trial court renders our review entirely discretionary, *see, e.g., In re W.E.P.*, 318 A.2d 286, 289 (D.C.1974), I think it improbable that their contention could be successfully maintained even if the point had been properly preserved in the trial court.

could also provide evidence of abuse to supplement the July 13 whipping, if the judge had found in the record the requisite nexus between these developments and the mother's behavior.[11] The problem, for me, is that the judge made no findings on these important matters, restricting himself exclusively to the events of July 13 and the mother's knowledge of S.K.'s psychological condition.

Given the restricted scope of the findings, I cannot agree with my colleagues or with the trial judge that the conduct of the mother on July 13, *standing alone*, constituted child abuse, or that it could justify the drastic interference with the life of this family which a finding of abuse may precipitate. The question whether the state should interpose itself into the relationship between a parent and child is a sensitive one. The primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). Although I view the welfare of the child as paramount, *Petition of Dep't of Pub. Welfare, supra*, 381 N.E.2d at 572, the child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit. *In re N.M.S.*, 347 A.2d 924, 927 (D.C.1975).

State intervention in the lives of families does not come without cost to the child. As one commentator has observed,

> there is substantial evidence that, except in cases involving very seriously harmed children, we are unable to improve a child's situation through coercive state intervention. In fact, under current practice, coercive intervention frequently

results in placing a child in a more detrimental situation than he would be in without intervention. This is true whether intervention results in removal of the child from his home or "only" in mandating that his parents accept services as a condition of continued custody.

*Wald, supra*, at 993.[12] This does not mean, of course, that the state ought not to intervene in serious cases of physical (or, for that matter, psychological) abuse. In the words of Professor Wald:

> [d]espite these reservations, state intervention should be authorized where there has been or is likely to be serious physical injury inflicted upon a child.

Once a battered toddler has been killed or seriously injured, the state can no longer rescue the child. A social worker or judge may understandably focus, in a close case, on a child's immediate well-being, notwithstanding the risks of psychological detriment occasioned by state intervention in the life of a family.

I do not doubt that a single act, if sufficiently drastic, could constitute abuse within the meaning of our statute. Most cases of physical chastisement in which abuse or neglect has been found, however, involve the kind of continuous pattern of mistreatment alleged here by Children's Hospital, rather than the single whipping, severe enough to leave welts for several days, but administered under extenuating circumstances, which formed the basis of the judge's decision. *See, e.g., In re Edward C.*, 126 Cal.App.3d 193, 178 Cal.Rptr. 694 (1981); *In re Young*, 50 Misc.2d 271, 270 N.Y.S.2d 250, 253 (1966) (while individual injury to child may not be evidence of neglect, overall pattern of a number of such

---

**11.** It may be that the judge did view S.K.'s psychological deterioration as being attributable to the mother's earlier conduct, and that this perception contributed to his decision. He did not frame the issue in this way, however, and he made no finding as to the cause of the deterioration.

**12.** Professor Wald points out that continuity of relationships is extremely important to children, and removing them from their families may cause grave psychological damage—damage which can be more serious than the harm inter-

vention is supposed to prevent. *Id.* at 994. There is general agreement among experts that placement in impersonal institutions which do not provide children with "attachment figures" is extremely detrimental. *Id.* Even less drastic intervention, such as a "protective supervision" order not involving removal of the child from the home, may often create harmful tensions, for the authority of the parents is subject to challenge by outsiders, a condition which may contribute to instability, uncertainty, and even reprisals against the child. *Id.* at 999.

injuries compels finding that parent has failed to carry out duty imposed by law).[13]

In the present case, the judge correctly concluded that the two or so blows with a belt would not, under ordinary circumstances, be sufficient to constitute child abuse within the meaning of the statute. He found against the mother because, in his words,

> [t]he likelihood of making the child's already disturbed mental state worse should have been evident to any reasonable person and restraint should have been exercised.

I am unable to discern in the record, however, any basis for concluding that the mother knew or should have known that corporal punishment which would otherwise have been a permissible exercise of parental discipline was converted into child abuse as a result of S.K.'s psychological condition. Although Dr. Tebor testified that whipping the child for setting a fire was inappropriate, this does not establish that the mother should have known this, or that a single overreaction under great pressure (which was all that the judge explicitly considered) was sufficient to make her a child abuser or to lay a predicate for major intervention in the life of this family for several years to come. Accordingly, I would vacate the judge's finding of abuse and his order placing the child under protective supervision, and remand for any further proceedings which might still be appropriate so long after the events complained of.[14]

---

**13.** As the Executive Director of the National Committee for Prevention of Child Abuse has observed, in comments reminiscent of the present case:

> Child abuse is usually *not* a single physical attack or a single act of molestation or deprivation. It is typically a pattern of behavior. Its effects are cumulative. The longer it continues, the more serious the damage.
>
> \*   \*   \*   \*   \*   \*
>
> Thirty to forty per cent of the parents involved in a case of child abuse have been involved in a previous case of child abuse. In twenty-seven per cent of the families involved in a case of child abuse, siblings of the most recent victim also have been victims of child abuse.

B.G. Fraser, *A Glance At The Past, A Gaze At The Present, A Glimpse At The Future: A Critical Analysis Of The Development Of Child Abuse Reporting Statutes*, 54 Chi.Kent L.Rev. 641, 643 (1978). (Emphasis in original).

**14.** Because a child's safety may be at stake, I would not preclude the government on remand from proving the truth of Children's Hospital's allegations in spite of the fact that it could have done so at the original hearing, for I am not prepared to insist on rigorous adherence to principles of waiver or estoppel if that might augment the risk to S.K.'s life or well-being. *See Fulwood v. Stone*, 129 U.S.App.D.C. 314, 317, 394 F.2d 939, 942 (1967) ("given the historic concern of the courts with the welfare of minors ... any court is properly reluctant to penalize a juvenile for procedural defaults, especially those of his attorney" or, as in this case, of the government). If the parties or the judge were to believe that further proceedings are appropriate, the judge would of course wish to determine, on remand, what has occurred since 1986.