In re A.M., an Infant.

Appeal of S.M.

No. 88-750.

District of Columbia Court of Appeals.

Argued Feb. 28, 1990.
Decided April 25, 1991.

Ruth Harthoorn, appointed by the court, for appellant.

Robert E. Sylvester, appointed by the court, for appellee A.M.

James C. McKay, Jr., Asst. Corp. Counsel, with whom Herbert O. Reid, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee District of Columbia.

Before BELSON, TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant S.M. appeals from a trial court order revoking protective supervision of her child, A.M., the result of which was to return A.M. to a foster home. S.M. contends that the court lacked authority to revoke its previously entered protective supervision order. We disagree and therefore affirm the order under review.

## I

In October 1983 the District of Columbia filed a petition in the Superior Court alleging that A.M., then six years old, was a neglected child.[1] The petition alleged that A.M.'s mother, S.M., had been sentenced in August 1983 to one year in jail for drug possession after her probation was revoked, that A.M. had been late for school fifty-seven times and absent from school fifty-five times during the two preceding school years, and that he had been "frequently sent to school unkempt and hungry." The petition also said that the whereabouts of A.M.'s father were unknown. Stipulations were entered by all parties to these facts and to the further fact that A.M. had sometimes been sent to school without adequate clothing. At the request of his maternal grandmother, A.M. was placed in shelter care on an emergency basis. The shelter care order was later renewed.

On August 28, 1984, A.M. was adjudicated neglected and committed to the custody of the Department of Human Services (DHS). The trial court held a hearing every six months thereafter, as required by D.C.Code § 16–2323(a) (1989), to review A.M.'s status. After one such hearing, on July 27, 1987, the court modified its original disposition by transferring A.M. from the custody of DHS to the custody of his mother, but under protective supervision. The court's July 27 order was conditional, requiring the mother to cooperate with her social worker in "seeking and accepting" medical and psychological treatment for herself and for A.M.,[2] and also to begin a program of family counseling, with a report to be made to the court at the next review hearing.

In March 1988 the District, citing ongoing neglect and repeated violations of the court's order by the mother, filed a petition under Super.Ct.Negl.R. 19 asking the court to revoke its protective supervision order. The mother, in her motion to dismiss the District's petition, argued that revocation of the order was not authorized by statute and that Rule 19 was "a mere procedural

---

1. D.C.Code § 16–2301(9) (1989) defines "neglected child" as including a child:

    (B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or

    \*   \*   \*   \*   \*   \*

    (D) whose parent, guardian, or custodian refuses or is unable to assume the responsibility for the child's care, control, or subsistence and the person or institution which is providing for the child states an intention to discontinue such care....

2. A report from Children's Hospital in June 1985, made after two examinations of A.M., had recommended individual psychotherapy on a weekly basis.

rule" which could not deprive her of her substantive legal rights. The court held a fact-finding hearing on the District's petition, resulting in the order from which this appeal is taken.

Two witnesses testified at the hearing: Thomas Gunnoud, a clinical social worker on the staff of Children's Hospital, whose job it was to diagnose and provide therapy to children and families, and Alberta Oliver, the DHS social worker assigned to A.M.'s case. Mr. Gunnoud stated that he first met A.M. on July 28, 1987, accompanied by his DHS social worker and his mother, S.M. It was agreed at that meeting that A.M. would make weekly visits to Children's Hospital for individual psychotherapy, with the first appointment scheduled for August 4. S.M. canceled that appointment, however, by phone and without apparent reason, and did not appear with A.M. on August 7, when the appointment was rescheduled. Thereafter S.M. failed to bring her son to any scheduled therapy sessions and never again called. Mr. Gunnoud said that on the only occasion when A.M. himself appeared for therapy, on December 18, 1987, he was brought in by a former foster parent, not by his mother.

Alberta Oliver, a DHS social worker for twenty-one years, was assigned to A.M.'s case. She testified that A.M. and his younger brother, V.M., had been removed from their mother's care and placed with foster parents on February 6, 1984, after having been found alone and unsupervised.[3] The children remained in DHS's custody until July 1987, when they were returned to their home. "Things went well for a while," Oliver said, but sometime around November of that year the children's situation began to deteriorate.

In February 1988 S.M. finally admitted to Oliver that she had a drug problem, that she had not been paying her rent, and that she was selling her food stamps to support her drug habit. Oliver took steps to enable S.M. to enter a drug-treatment program at Seton House, but S.M. "never followed through on it."[4] Finally, on May 4, S.M. was admitted to a twenty-one-day inpatient drug program at District of Columbia General Hospital after Oliver herself had taken her there. When Oliver telephoned the hospital on May 9, however, she learned that S.M. had discharged herself and left. S.M. later told Oliver that she had signed herself out because "she didn't like the program." After this happened, Oliver "told her if she walked out of D.C. General, I'm not running around trying to transport her different places because I felt that if she wanted help, she would have stayed there. And she told me she was going to and I wouldn't have to worry about it."

At the close of the District's case, the trial court asked counsel for S.M. if she had any evidence to controvert Oliver's testimony. Counsel replied that she did not. The court then said:

> ... In the first place, the Court noted yesterday and notes today that, on July 27, 1987, that [A.M.] was released in a protective supervision status, after having previously been adjudicated neglected, to his mother, and that that disposition order says, "It is hereby ordered that the child be permitted to remain in his home provided that the following conditions are observed". One of those conditions was that [the mother] cooperate with her supervising officer, the social worker, in seeking and accepting, among other things, psychiatric treatment for the child.
>
> Ms. Oliver, or the Department of Human Services, made it possible for [the

---

3. Oliver later testified that she had knowledge of three additional episodes in November 1987, January 1988, and February 1988 when either the police or DHS had to intervene because the children had been left unsupervised. On the first of these occasions, in November 1987, Oliver attempted for an entire day to locate the children's mother, first by telephone and then by personally visiting the mother's home, but her efforts were unsuccessful.

4. On cross-examination, when asked whether she proposed any other drug-treatment programs to S.M., Oliver testified that she discussed getting her into programs at Howard University Hospital and Saint Elizabeths Hospital, in addition to Seton House (which is affiliated with Providence Hospital).

mother] to comply with that condition. Based upon the testimony of the witness who testified yesterday, the psychologist [Mr. Gunnoud], it is absolutely clear that [the mother] has not complied with that condition; that is, she has not taken [A.M.] to the therapist as she should have.

It is also a condition of the protective supervision that the child be properly cared for. For an eleven-year-old child, or a ten-year-old child, it should be obvious to any parent that the child must be in the physical presence of that parent for—during an appropriate time, during the nighttime, for instance. And, according to Ms. Oliver, there were three occasions when this was not so; that is, the child had been left alone. There is no contesting either one—any of those allegations.

My view is that the Court makes two determinations; one, whether the allegations contained in the affidavit have been shown, and then [it] must determine whether to revoke protective supervision. It's very much like a juvenile probation proceeding or an adult probation proceeding; which is to say—and I make this point in response to Ms. Harthoorn's suggestion that it would not be enough to revoke protective supervision where ... "just the technical violations are shown," that is, where it is shown—as it was only shown today during the course of this hearing that therapy—that there was not therapy.

It may be relevant in another case, I submit, to show that although the therapy sessions were not kept, that there [was] also some damage. For instance, in a case where a mother had, for purposes of example, ten conditions—rather onerous conditions—and there was one condition which she did not comply with, I think a reasonable argument could be made that even though there was a violation of a condition of the protective supervision, the Court would view this [with] discretion and should not revoke

it. But that's another case. That's not this case. And I suggest that the Court is able to infer that there was damage. I think that's a reasonable inference as drawn from—that can be drawn from ordering the therapy in the first place. The Court doesn't have to blink at the reality that there is a reason for therapy.

There is damage, if only because whatever symptom, whatever condition [A.M.] has is not being treated. So there's damage in just maintaining the status quo. The court could make that inference.

The court then ordered that protective supervision be revoked. Addressing the legal arguments advanced by counsel for the mother, the court stated:

I wonder whether [the mother] has waived whatever ... rights she has to challenge the ... "authority of the Court" to revoke protective supervision at this stage when she has, in fact, accepted the conditions. You know, citizens have the right to waive all kinds of rights....

... [The mother] agreed to be bound by these conditions and agreed and acknowledged that failure to comply with any of the conditions might very well result in a revocation of the protective supervision.

Some time later the court entered a final order, retroactive to the date of the hearing, revoking protective supervision and committing A.M. to the custody of DHS, which in turn placed him in a foster home.[5] This appeal followed.

II

■ Appellant contends that the trial court lacked authority to revoke its protective supervision order regarding the care of A.M. We hold, to the contrary, that such authority was expressly granted by statute, namely, D.C.Code § 16–2301(19) (1989). Moreover, even if that statute did not exist, the best interests of the child—the controlling factor in any neglect proceeding—

5. In October 1988 the trial court held its semi-annual review hearing and determined that no change in the disposition was warranted. Two subsequent hearings, held in April 1989 and October 1989, continued the placement of A.M. in the foster home.

would support the court's action in this case.

On July 27, 1987, the court modified its original order by transferring A.M. from the custody of DHS and placing him with his mother under protective supervision. The protective supervision was conditional, requiring that S.M. accept psychological treatment for both herself and A.M., and that S.M. submit to family counseling. The July 27 order also contains a section entitled "Acknowledgment," which reads as follows:

This Order has been explained to me and I understand and accept its conditions. In addition, I understand that:

1. If all the terms and conditions specified above are observed and no new neglect complaint is received by the Division, this order will automatically expire in one year on July 27, 1988.

2. Upon the recommendation of the Director of Social Services, this order may be terminated in less than a year.

3. If the terms and conditions are not complied with, the Division may, after notice and hearing, extend this order for an additional year.

4. *Failure to comply with any of the conditions of this order may cause this order to be revoked and the custody of the child transferred to an appropriate person, institution, or facility.* [Emphasis added.]

Immediately below these paragraphs appear the signatures of S.M., her attorney, and the attorney for A.M. Given this record, S.M. cannot reasonably assert that she did not know, at the time the protective supervision order was entered, that it was subject to revocation if she violated its conditions.

S.M. cannot, and does not, contest the court's authority to enter a protective supervision order, since protective supervision is specifically listed in D.C.Code

§ 16–2320(a)(2) (1989) as a possible disposition of a case in which a child is found to be neglected. Instead, her argument, in essence, disputes the court's power to enforce such an order, notwithstanding the express language in this particular order stating that it was subject to revocation if S.M. failed to comply with its conditions. Our acceptance of such an argument not only would undermine the established principle that any court has inherent authority to enforce its own orders, *see In re Marshall,* 467 A.2d 979, 980 (D.C.1983), but would be contrary to the statutory scheme designed to protect neglected children from the sort of risk to which A.M. was subjected in this very case.

Our neglect statute was enacted in 1970 by Congress as part of the District of Columbia Court Reorganization Act, Pub.L. No. 91–358, § 121(a), 84 Stat. 475, 522 (July 29, 1970). That Act created the Superior Court of the District of Columbia, established within that court a Family Division, and prescribed, for the first time, elaborate procedures within the Family Division for the care and treatment of neglected children in the District of Columbia. Included among the relevant statutory provisions is D.C.Code § 16–2301(19), which defines "protective supervision" as a "legal status created by Division order in neglect cases whereby a minor is permitted to remain in his home under supervision, *subject to return to the Division during the period of protective supervision*" (emphasis added).[6] As a matter of statutory construction, we hold that the italicized language authorizes the Family Division to revoke a protective supervision order at any time while the order is in effect. Rule 19 of the Superior Court's Rules Governing Neglect Proceedings, under which the District filed its petition, sets forth procedures for the revocation of such orders and grounds on which revocation may be based.[7] The rule

---

**6.** As used in all the statutes and rules involved in this case, the term "Division" refers to the Family Division of the Superior Court. *See* D.C.Code § 16–2301(1) (1989).

**7.** Super.Ct.Negl.R. 19(a) provides:

If a parent or other person legally responsible for a child's care is brought before the Division *for failing to comply with the terms and conditions of an order* entered pursuant to D.C.Code § 16–2320(a)(1), (2), or (3)(C), and if, after hearing, the judge is satisfied that the parent or other person failed to comply

does not, as appellant contends, abridge any substantive right of appellant or any other parent,[8] for the statute makes clear that every protective supervision order is subject to revocation—"return to the Division"—at any time. Neither appellant nor anyone else has a substantive right to a permanent, irrevocable protective supervision order.

■ Appellant argues that the authority of the court to revoke a protective supervision order cannot be based on language in a section of a statute that contains only definitions. This argument is totally unpersuasive. The definition section, section 16–2301 of the Code, was enacted at the same time as the rest of the neglect statute and must be read in combination with all of its other provisions. *See, e.g., Willcher v. United States*, 408 A.2d 67, 77–78 (D.C. 1979). The fact that Congress chose to confer power on the court through its definition of protective supervision, rather than by enacting a separate section, has no effect on the statutory scheme as a whole. A statute is a statute, and each part is as effective as any other part in furthering the legislative purpose. Indeed, as Sutherland tells us, statutory definitions "furnish official and authoritative evidence of legislative intent and meaning, and are usually given controlling effect." 1A SUTHERLAND, STATUTORY CONSTRUCTION § 27.02 (4th ed. 1985).[9]

■ Finally, the case law in this jurisdiction supports the trial court's decision to revoke the protective supervision order.

The court unquestionably had continuing jurisdiction over the custody of A.M. *In re O.A.*, 548 A.2d 499, 501 (D.C.1989); *In re D.W.G.*, 115 Daily Wash.L.Rptr. 2109 (D.C. Super.Ct. June 26, 1987); D.C.Code § 16–2303 (1989). Furthermore, the purpose of a neglect proceeding is to protect and assist a child who is in need of assistance, and statutes governing such proceedings are to be liberally construed. *In re S.K.*, 564 A.2d 1382, 1388–1389 (D.C.1989) (opinion of Schwelb, J.).[10] In neglect cases, as in most other matters involving the welfare of children, the legal touchstone is the best interests of the child, and those interests are controlling. *See In re Lem*, 164 A.2d 345, 348 (D.C.1960) ("The court had the duty to view all the evidence with the best interests of the child as its guide to an ultimate determination"). The rights of a natural parent regarding the child are subject to due process protection, but those rights are not absolute and must give way before the child's best interests. *In re N.H.*, 569 A.2d 1179, 1181–1182 (D.C.1990); *see In re M.M.M.*, 485 A.2d 180, 184 (D.C. 1984) (in proceeding to terminate parental rights, best interests of child must prevail over interests of parent).

Furthermore, we may reverse a trial court's determination of where the best interests of the child lie only when the court has abused its discretion. *In re D.R.M.*, 570 A.2d 796, 803 (D.C.1990) (citing cases). In applying that standard, "our task is to ensure 'that the trial court has exercised its discretion within the range of

---

with the terms of the order, the judge may revoke the original order and enter any other order that might have been made at the time the original order was entered. [Emphasis added.]

Subsection (b) of the rule states that a proceeding to revoke an order "shall be commenced by the filing of a revocation petition by the Corporation Counsel upon recommendation by the Director of Social Services," which is what happened in this case. Subsection (c) provides that both the parent and the child must be represented by counsel at any hearing on such a petition.

8. *See In re C.A.P.*, 356 A.2d 335, 343, *rehearing en banc denied*, 359 A.2d 11 (D.C.1976), in which this court held that the Superior Court may not adopt a rule which abridges any substantive right.

9. Appellant's analysis of the legislative history is likewise flawed. It is true that Congress failed to explain why it had not included in the statute certain suggested language concerning the revocation of protective supervision of a neglected child. From that failure, however, it does not follow that Congress affirmatively intended not to permit such revocation, especially when the very definition of protective supervision in section 16–2320(19) contains language which appears to authorize exactly that.

10. All of the judges in the *S.K.* case concurred in this portion of Judge Schwelb's separate opinion. *See* 564 A.2d at 1383.

permissible alternatives, based upon all relevant factors and no improper factor ...' and then '[to] evaluate whether the decision is supported by "substantial" reasoning ... "drawn from a firm factual foundation" in the record.'" *Id.* at 803–804 (citations omitted). Given the detailed statement by the trial judge in this case, the procedural safeguards afforded to appellant by the fact-finding hearing, and the past record of neglect of A.M., there is no way in which we could find that the trial judge abused his discretion in ruling as he did.

*Affirmed.*