**Sharon PROST, Appellant,**

v.

**Kenneth GREENE, Appellee.**

No. 94–FM–1090.

District of Columbia Court of Appeals.

Argued Nov. 29, 1994.

Decided Jan. 5, 1995.

Charles F.C. Ruff, with whom Caroline M. Brown, Armin U. Kuder, and Theresa M. Mihalik, Washington, DC, were on the brief, for appellant.

Sandra G. Wilkof, Washington, DC, for appellee.

Carolyn P. Osolinik, Andrew J. Pincus, and Laurie R. Rubenstein, Washington, DC, filed a brief on behalf of amici curiae The Women's Legal Defense Fund, The Feminist Majority Foundation, The Georgetown University Law Center Sex Discrimination Clinic, The National Organization for Women, The NOW Legal Defense & Education Fund, The Women's Bar Association of the District of Columbia, and The Women's Law Project.

Mary Jo Cusack, Columbus, OH, filed a brief on behalf of amicus curiae The National Ass'n of Women Lawyers.

Ronald K. Henry, Washington, DC, filed a brief on behalf of amicus curiae The Children's Rights Council.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

Opinion for the court by Associate Judge FARRELL.

Concurring opinion by Associate Judge SCHWELB at p. 632.

FARRELL, Associate Judge:

In this appeal from a judgment of divorce, award of child custody and support, and distribution of property, appellant's primary contention, vigorously maintained, is that the trial judge abused her discretion in granting sole legal and physical custody of the two children to appellee, the father, subject to liberal visitation by the mother. The judge reached this decision after an approximately two-week trial and entry of some 26 pages of written findings of fact and conclusions of law addressing the custody issue alone. We reject the assertion of some *amici* that the judge's reasoning is infected with gender stereotyping, and in general we reject appellant's argument that the judge failed properly to consider the relevant statutory factors or made errors of fact that undermine the validity of her exercise of discretion. Only one shortcoming in the judge's analysis leaves us unable to affirm the judgment at this time: her failure adequately to resolve factual issues concerning appellant's claims of physical assault by appellee, some of which had led to a court-issued Temporary Protection Order (later continued by the parties' consent) at the time appellant filed for divorce. We therefore remand the case for further proceedings devoted to this issue.[1]

## I.

At trial the parties (hereafter Prost and Greene) agreed upon little except the chronology of their marriage and the birth of their children, their respective employment histories, and their separation. The couple met in 1980 and were married in 1984. The first child, Matthew, was born in 1987; the second, Jeffrey, in 1990. From 1985 until October 1992, the couple lived in a home which they jointly purchased in the District of Columbia.

At the time they married, Prost was employed as Assistant Solicitor for the National Labor Relations Board (NLRB). Greene was the executive director of the National Education Association Staff Organization (NEASO). In April 1988 Greene left NEASO to become executive director of Council 20 of the American Federation of State, County and Municipal Employees (Council 20). In March 1989, Prost became Chief Minority Labor Counsel of the Senate Labor and Human Resources Committee. In September 1990 Greene quit his job with Council 20; thereafter he held a temporary position with the Peace Corps, then served briefly as a consultant or contractor to the Peace Corps, and worked for short periods as a field examiner with the NLRB and under a contract with the Federal Mediation and Conciliation Service. Except for these brief intervals, Greene was unemployed from the time he left Council 20 until March 1993, when he became assistant executive director of the American Federation of Television and Radio Artists and Screen Actors Guild (AFTRA). Meanwhile, in January 1993, Prost moved from the Senate Committee on Labor and Human Resources to the Senate Judiciary Committee, where she became chief counsel for the then-minority party.

By December 1991 Prost had consulted a lawyer about divorcing Greene, and by January 1992 the parties had agreed to divorce, but also to delay the divorce until Greene found employment. By early 1992 they had moved into separate bedrooms in the family house. On October 24, 1992, Prost left the house with the children, who were then five and two years old respectively. After consulting with her attorney, she sought a Civil Protection Order (CPO) in the Superior Court, receiving a Temporary Protection Order (TPO) the same day. Pursuant to the TPO, Greene left the house and Prost returned to it with the children. On October 29, 1992, Prost filed suit for divorce. At a CPO hearing in December 1992, the parties agreed to extend the TPO for one year, thus leaving custody of the children with Prost but with allowance for visitation by Greene. This order remained basically in effect

---

1. As set forth *infra*, note 28, we reject appellant's claims with respect to the division of marital assets.

through the trial, which began in December 1993.[2]

## II. The Trial Court's Opinion

The parties presented often sharply contradictory testimony about their relationship with one another and with the children. The trial judge made detailed findings of fact attempting to resolve this conflicting evidence. The judge found that, in general, "[b]oth parents have been responsible for and provided care for their children." Specifically, except during the first several months of Matthew's life, Prost and Greene were "full and equal caretakers of Matthew from his birth [in 1987] through at least February 1989." During this time they placed Matthew in a daycare facility across the street from Prost's office and commuted to and from work together, dropping him off and picking him up on the way.

A change in the couple's relationship began in approximately March 1989, when Prost left the NLRB for her job with the Senate, a position which the judge found "was much more demanding than the NLRB had been, in terms of both time and energy." Prost "now worked much longer hours, and [Greene] began bringing Matthew home in the evenings, alone." This custom persisted, the judge found, with the result that since "at least March 1989" Greene "has been the more nurturing parent of the children, assuming the greater portion of the parental obligations and handling the daily details necessary to provide for the children's physical and emotional well-being and development." The judge based this finding, in significant part, on the testimony of Stephanie Werner, the parties' au pair for approximately thirteen months in 1991 and 1992. The judge found Werner's testimony "credibl[e]" and summarized it as follows:

> [Werner] testified that [Prost] generally returned home from work between 7 and 8 p.m. Stephanie recalled only 4 or 5 in-

stances, during the year that she lived with the parties, that the whole family had dinner together, and that was when Gary Palmquist [a friend of the couple] joined them. (Even then, Stephanie and Palmquist agree, [Greene] cooked and served the meals and cleaned up afterwards.) Otherwise [Prost] always ate dinner alone and very late at night—often, while sitting on the kitchen floor, with her plate on the floor, talking on the telephone or writing while she was eating. About once a month, Stephanie reported, [Prost] came home early, to cook dinner for the children; this was always treated as the special event that it was although, even on those occasions, [Prost] usually ate standing at the stove or elsewhere in the kitchen, rather than at the table with the children. (Footnotes omitted).

The judge also found that Greene, "because family is of prime importance to [him], ... has been very involved in the children's activities and has made them a priority in his life," whereas Prost "is simply more devoted to and absorbed by her work and her career than anything else in her life, including her health, her children and her family" (footnotes omitted). With respect to Greene, the judge cited two employment decisions (turning down a job in 1990; taking his present job despite a pay reduction) which both stemmed from his desire to spend as much time as possible with the children.[3] Altogether, she concluded, Greene "has prioritized the care and well-being of his children, striking a delicate balance between parenthood and his career." With regard to Prost, the judge found that

> [her] many positive contributions to the family unit ... have been limited by her employment and personal pursuits. Her career choice of demanding jobs that require her to work late nights and many weekends necessarily cuts into the time available for her family. [Prost's] involve-

<hr>

2. The trial court heard seven days of testimony in December 1993 and four more days in January 1994.

3. The judge found the testimony "overwhelming that 'the father and children are very attached,'"

that "[Greene] 'is a very loving father [who] speaks a lot about his children; they are #1 in his life; it's a very close relationship,' and that 'the kids really obviously loved Ken and showed a lot of affection to him ...'" (Footnotes citing testimony omitted).

ment in the children's lives takes place *around* her long work day and, even then, her devotion to her job and/or her personal pursuits often takes precedence over her family. (Emphasis in original; footnote omitted).[4]

The judge also found that Prost "is much more emotionally volatile and unstable than [Greene]," having displayed "intense emotional reactions and ... demonstrated insensitivity" to (among other things) Greene's periods of unemployment and resultant depression.

Of particular concern to the judge was the "rigid[ity]" Prost had shown during the past year and a half (when she had sole custody) toward Greene's right of visitation. This was important because, despite a marriage and separation marked increasingly by a "high level of stress, tension and animosity between the parties," both parents "have provided a supportive, loving, structured and nourishing environment in which the children may thrive," so that "[i]t is overwhelmingly in the children's best interests that they. spend substantial time with both their parents...."[5] Yet the judge cited repeated instances of "[in]flexib[ility]" by Prost which "bode[ ] ill for both the atmosphere and the extent of the time that she would permit the children to spend with their father (regardless of any court order)...."[6]

In sum, while concluding that the two children "are charming, bright and healthy youngsters who love their parents and each other," and that regular interaction with both parents would be important to their "development into independent, well-rounded, con-

fident adults," the judge found by a preponderance of the evidence that the best interests of the children, together and separately,[7] would be served by granting sole custody to Greene but at the same time liberal visitation rights to Prost.

## III. Discussion

Custody determinations, not just in their extreme forms of neglect and termination of parental rights decisions, are among the most difficult a trial judge must make. Former Chief Judge Hood keenly understood the difficulty:

Out of a maze of conflicting testimony, usually including what one court called "a tolerable amount of perjury," the judge must make a decision which will inevitably affect materially the future life of an innocent child. In making his [or her] decision the judge can obtain little help from precedents or general principles. Each case stands alone. After attempting to appraise and compare the personalities and capabilities of the two parents, the judge must endeavor to look into the future and decide that the child's best interests will be served if committed to the custody of the father or mother. He starts with the premise ... that the best interests of the child would be served by living in a united home with the affection, companionship and care of both father and mother, but that possibility has been eliminated before the case reaches the judge. So, the question for him is what is best for the child within the limitations presented. When the judge makes his decision he has no

---

4. The judge noted, for example, the "[n]umerous references throughout the testimony describ[ing] Prost] as 'very tightly wound,' 'driven to succeed,' and 'intensely dedicated to achievement'...." *As one illustration of Prost's "absorp[tion] by her work,"* the judge pointed to her conduct before and after the birth of the second son, Jeffrey, culminating in the fact that, "despite the difficulty of her pregnancy, [Prost] returned to work immediately after Jeffrey was born...."

5. The judge emphasized this point. "It is important that the children maintain substantial and regular contact with both parents so that they can realize and reap the benefits of the love, the support and the individual personalities of both their mother and their father...."

6. A "prime example," the judge pointed out, "occurred on December 10, 1992, not even 2 months after the parties separated. [Prost] filled out a 'Parent Information Form' for an employment agency that had found her a live-in child care provider. In the space for 'Father's Name' [Prost] wrote 'N/A.' She left blank the lines for 'Father's Profession and Telephone Number.' And she listed the name and telephone number of her mother, Ester Prost, as the 'Individual To Contact In Case Of An Emergency.' " (Footnotes omitted.)

7. The judge found that the evidence strongly supported "keeping the children together," a conclusion with which neither party has disagreed on appeal.

assurance that his decision is the right one. He can only hope that he is right. *Coles v. Coles,* 204 A.2d 330, 331–32 (D.C. 1964).

Of course, the judge's decision may not rest on "hope." D.C.Code § 16–914(a) (1989) states that "[i]n determining the care and custody of infant children, the best interest of the child shall be the primary consideration," then sets forth a non-exclusive list of relevant factors which the judge must consider in determining that interest:

> (1) the wishes of the child as to his or her custodian, where practicable,
>
> (2) the wishes of the child's parent or parents as to the child's custody,
>
> (3) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest,
>
> (4) the child's adjustment to his or her home, school, and community,
>
> (5) the mental and physical health of all individuals involved.[8]

■ Recognizing the intensely individual nature of custody determinations, however, this court accords those decisions great deference. *Dorsett v. Dorsett,* 281 A.2d 290, 292 (D.C.1971). It will reverse a custody award only for a clear abuse of discretion. *Fitzgerald v. Fitzgerald,* 566 A.2d 719, 721 (D.C. 1989); *Moore v. Moore,* 391 A.2d 762, 770 (D.C.1978). And the required abuse is not shown merely because "other evidence in the record might have led us to uphold a decision going the opposite way." *Dorsett,* 281 A.2d at 292. Factual findings that inform the judge's choice are reviewed only for clear error, D.C.Code § 17–305(a) (1989), and, within limits, the choice will be sustained despite errors committed in its exercise. *See Johnson v. United States,* 398 A.2d 354, 366–67 (D.C.1979). In essence, this court looks to whether the trial judge has considered all relevant factors and no improper ones, and to whether her decision is then supported by substantial reasoning drawn from a firm factual foundation in the record. *In re A.M.,* 589 A.2d 1252, 1257–58 (D.C.1991); *Johnson,* 398 A.2d at 364–66.

Prost attacks the trial judge's exercise of discretion on multiple grounds. First, she asserts that the judge failed to consider adequately the statutory factor of the children's adjustment to their home, specifically, the fact of their residence with the mother as sole custodian during the approximately fifteen months preceding the trial. Second, the judge assertedly abused her discretion (a) in focusing unduly on Prost's relationship with Greene, marked by mutual and increasing hostility, "to the virtual exclusion of her relationship with her children," and (b) in substituting her "lay opinion" of the children's best interests for that of the expert witnesses, particularly the child psychiatrist, Dr. Noshpitz. Third, Prost argues that the judge's determination that Greene would be the better custodian rested on factual errors depriving it of the required firm foundation. And fourth, she contends that the judge made inadequate findings concerning the evidence that Greene had physically assaulted her on multiple occasions, sometimes in the presence of the children. We consider these arguments in succession.

**A. Asserted disregard of "the child's adjustment to his or her home, school, and community" (D.C.Code § 16–914(a)(4)).**

■ Prost first argues that the judge gave too little weight to the successful adjustment of the children to their sole custodial relationship with the mother in the fifteen months between Greene's departure from the home and the trial,[9] and to the discontinuity in their lives that would be fostered by transferring them to the father's custody. We find no abuse of discretion in this regard.

---

8. Effective August 25, 1994, the Council of the District of Columbia added a sixth statutory factor, "evidence of an 'intra-family offense' as defined in section 16–1001(b)." D.C.Law 10–154, 41 D.C.Reg. 6839 (Sept. 16, 1994) (codified at D.C.Code §§ 16–914(a)(6), –914(a–1)). See *infra,* part III.D.

9. At that point the record in the case closed, and we decline Prost's invitation to extend the relevant period to include the time during which the judge had the case under advisement and beyond, concerning which the judge naturally had heard no testimony.

The judge acknowledged this fifteen month period, which coincided with the pendency of the litigation,[10] pointing out that the children had "done well" under the arrangement giving Prost custody and Greene liberal visitation rights.[11] But the judge was unpersuaded that transferring custody to the father would dramatically alter ("utterly disrupt")[12] a relationship with both parents that, despite growing rancor between the adults themselves, had given the children "a supportive, loving, structured and nourishing environment" in which the youngsters "love their parents and each other." The judge viewed the latest custodial period within the framework of the children's entire lives, particularly that of Matthew, who from his birth in 1987 until October 1992 had been in the custody of both parents. Even after that date, according to the judge, the father "continued to be a significant and frequent presence in the children's lives."[13] The custody decision the trial judge was called upon to make would predictably affect the children's lives until the age of majority (or until an age when their own view of their best interests became more determinative). Highlighting Prost's role in the most recent, interim custody arrangement at the expense of the attachment the children had formed with both parents could be contrary to the children's best interests.

The two cases Prost cites in which we remanded for further consideration of the children's adjustment during a period of single-parent custody following separation are very different from this one. The "unique circumstances" causing the remand in *Rutledge v. Harris*, 263 A.2d 256 (D.C.1970), were that "the father's contact with the children was ... permeated with a history of mutual indifference" and that none of the children (two of whom testified at trial)

wished to live with him. *Id.* at 257–58. In *Utley v. Utley*, 364 A.2d 1167 (D.C.1976), the trial judge "made *no findings* respecting the quality of the mother's [recent] custody of the child ... [or] the child's adjustment during that period." *Id.* at 1168 (emphasis added). In this case the judge found that both parents "clearly love their children very much" and had been involved continuously in their nurturing. Her refusal to give predominant weight to Prost's custody over the past fifteen months, during the pendency of the litigation, was not an abuse of discretion.

**B. Claimed "improper focus on Prost's interaction with Greene" and failure to credit expert testimony.**

■ Prost argues that the trial judge failed adequately to consider "the interaction and interrelationship of the [children] with [their] parent or parents," D.C.Code § 16–914(a)(3), but instead focused inordinately "on the negative aspects of Prost's relationship with Greene." We reject this argument, which itself focuses unduly on the absence of findings or evidence "that Prost ever displayed any untoward behavior in her relationship with Matthew and Jeffrey."

■ Prost's argument is not so much that the judge failed to consider, and indeed make findings as to, each parent's relationship with the children as it is that she highlighted Prost's hostile relationship with Greene, particularly during the last year they lived in the marital home, without evidence that this affected the health and well-being of the children. As the trial judge recognized, however, the interaction of parents with each other can relate directly to the children's best interests, especially as concerns a factor that was paramount for the judge: which parent would predictably cooperate most in according the *other* a regular and substantial role in the children's lives.

---

10. On October 26, 1992, the Temporary Protection Order was issued, and on October 29 Prost filed the complaint in the present action.

11. "[S]ince October 26, 1992 [Prost] has had physical custody of the children and [Greene] has had visitation every other weekend (from 9:00 a.m. Saturdays to 8:00 p.m. Sundays), every Wednesday night (Matthew overnight and Jeffrey until 8:00 p.m.), and every other Monday evening (for dinner only)."

12. This was Prost's phrase in her motion to alter or amend the original judgment.

13. The judge noted, for example, Greene's regular involvement in school functions while Matthew was in kindergarten. Prost does not dispute this participation, contending only that the judge disregarded her own equal involvement in Matthew's schooling. See *infra*, note 18.

The judge found it to be "overwhelmingly in the children's best interests that they spend substantial time with both their parents...." It is basic law that, where custody must be given to one parent rather than the other, "[t]he court does not abuse its discretion by [nonetheless] determining that the best interest of the child requires developing the best possible relationship with both parents." 27C C.J.S. *Divorce* § 621(b) (1986) (footnote omitted). "Conduct [by the custodial parent] which interferes with the fulfillment of children's need for the guidance and love of [the non-custodial parent] may have a serious effect on the welfare of the children." *Kahn v. Kahn,* 252 A.2d 901, 903 (D.C.1969). Indeed, some jurisdictions by statute require a court, in determining custody, to consider a parent's willingness and ability to promote a positive relationship between the children and the other parent. *See* Katheryn Katz, *Custody Disputes Between Parents, in* 2 CHILD CUSTODY & VISITATION LAW AND PRACTICE, 10–1, § 10.06[2], at 10–115 & n. 44 (John P. McCahey et al. eds. 1994) (citing statutes).

The trial judge's discussion of the relationship of Prost and Greene related directly to this issue. The judge cited behavior by Prost toward Greene both before and after the parties' separation [14] causing her to fear that Prost would limit the children's contact with Greene "regardless of any court order." [15] We cannot say, as a matter of law, that this concern was outweighed by Prost's evidence (through Dr. Noshpitz) that the mother and children *inter se* revealed "a tender sense of unity." Moreover, beyond the judge's concern about future visitation, there is support in the record for her finding that Prost "is much more emotionally volatile and unstable than [Greene]," [16] a finding undeniably relevant to the children's best interests. D.C.Code § 16–914(a)(5) ("the mental ... health of all individuals involved"). We qualify this conclusion, however, by reference to our discussion in part III.D., *infra.*

■ The judge was also within her authority in rejecting Dr. Noshpitz's recommendation that Prost be awarded sole custody. Dr. Noshpitz, who initially had been retained by both parties to evaluate the family relationship, testified that while Greene is "a more talented child handler" than Prost, Prost would be better able than Greene to give the children "a kind of stability, a kind of predictability, a kind of regularity, a structure, a sort of evenness of living...." Dr. Noshpitz's methodology and conclusion, however, were criticized by another psychiatrist, Dr. Miller, who noted particularly his failure to interview the children at greater length.[17]

14. The behavior went back as far as Greene's quitting his job with Council 20 in September 1990, and Prost's "insensitive and insecure response to [Greene's] unemployment and depression." See *infra*, note 25.

15. As the trial judge pointed out, some of Dr. Noshpitz's testimony, otherwise favorable to Prost, was instructive in this regard:

> As to visitation generally, Dr. Noshpitz said that plaintiff could be flexible "if she were not challenged." But once she "becomes roiled" and "feels that her boundaries have been invaded, she sees *everything* as an invasion and becomes rigid." The doctor illustrated his analysis with an example (to which the parties also testified): defendant went to the local swimming pool on "plaintiff's weekend." When he saw that his wife and children had arrived (after he did), he greeted them and began "horsing around" with the children. Plaintiff became very upset that defendant had intruded on her weekend, and demanded that he leave (which he did). (Emphasis in original; footnote omitted.)

16. The judge cited, for example, the testimony of witnesses (including Stephanie Werner), that Prost "was hysterical, yelling and crying during" the period of Greene's unemployment, as well as testimony by Dr. Noshpitz "that Prost 'is an excitable person, who reacts intensely,' and gets very upset and frantic about the consequences of minor things...." At oral argument, Prost's counsel asserted that more than one "witness" the judge relied on for Prost's asserted hysteria never in fact testified. We think Prost misconstrues the judge's findings. The judge meant not that the persons (Greene's psychologist Dr. Ramsey and Greene's then-attorney Harvey Bass) with whom Prost spoke had testified, but that *others* (Prost and Dr. Noshpitz with respect to Dr. Ramsey, and Greene with respect to Bass) testified, or prepared documents that were introduced into evidence, concerning these conversations. The judge had substantial support in the record for these findings.

17. As Dr. Miller pointed out, Dr. Noshpitz met only once with each child alone and only once with each parent and the children together. By contrast, Dr. Noshpitz met thirteen times with Prost, and ten times with Greene. This near-exclusive reliance on facts related to him by the

Partly on this basis, the trial judge found that Dr. Noshpitz had paid inadequate attention to the children's "current psychological status and relationship to each parent." Moreover, the judge reasoned:

[A]s important as are structure and order, they are not the be-all and end-all. At least as important ... are the lessons that children learn from the intensive presence, participation and involvement of a parent in their lives, from the frequent and sincere demonstrations of a parent's love and concern for them, from a parent's efforts to help them solve their problems, and from their observation that a parent enjoys being with them and, indeed, has fun with them.

On the basis of her familiarity with the entire record, including Dr. Noshpitz's report and testimony, the judge found that "[o]n all of these fronts, the evidence is clear, defendant has it way over plaintiff."

 The trial court may not "arbitrarily disregard[ ], disbelieve[ ] or reject[ ]" an expert's uncontradicted testimony. *Rock Creek Plaza–Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983) (quoting *Medical Service of the District of Columbia v. Llewellyn*, 208 A.2d 734, 736 (D.C.1965)). Nevertheless, once "there is some basis in the record" for the judge's refusal to accept an expert's conclusion, "we will not pit our judgment against that of the finder of fact who saw and heard the witness testify." *Richbow v. District of Columbia*, 600 A.2d 1063, 1066–67 (D.C.1991). The judge's refusal in the circumstances to be bound by Dr. Noshpitz's recommendation was not an abuse of discretion.

## C. The asserted factual misreading of the evidence.

 Prost contends that the trial judge made numerous factual errors in reciting the evidence, that these infected her critical finding about the relative caretaking abilities of the parties, and that when Prost brought these errors to the judge's attention in her motion to alter or amend the judgment, the judge dismissed them with the observation that, "even were all the alleged factual mistakes eliminated from the Findings," she was still "satisfied beyond any doubt that ... [her] opinion would not change."

Contrary to Prost's argument, we do not regard the asserted factual errors, singly or in the aggregate, as sufficient to undermine the firm foundation the record provides for the judge's ultimate determination. Admittedly, key features of the judge's ruling were her finding that "since at least March 1989, [Greene had] been the more nurturing parent of the children, assuming the greater portion of the parental obligations," and the converse finding that Prost "is simply more devoted to and absorbed by her work and her career than anything else in her life, including ... her children and her family." Admittedly, too, the judge (relying on her trial notes since the transcript was not then available) made factual errors related to both of these findings. For example, she overstated the frequency of visits (for dinner and overnight) to the marital home by Greene's friend Larry Brown, whose testimony the judge found confirmed Greene's greater involvement than Prost's in "handling the daily details necessary to provide for the children's physical and emotional well-being and development." The judge also apparently misunderstood Prost's testimony that she regularly left work at the Senate at 4:30 p.m. "when the Senate was not in session" to mean that she did so only rarely—for example, on holidays—when in fact the Senate is frequently not "in session," an error Prost claims seriously distorted the judge's understanding of her work schedule and hence absence from home.

These and other defects in the judge's

---

parties, while of course permissible, *see Blunt v. United States*, 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957), is troubling given that the parties' representations to Dr. Noshpitz were quite clearly colored by the impending custody battle. Dr. Noshpitz noted, for example, that Prost was very reluctant to disclose anything that

might be held against her in litigation. And "[m]uch of what [Greene] spoke of [to the psychiatrist] was his philosophy of child rearing, with many examples of how he intervened with the children when they displayed problem behavior to set matters right, and how well this worked."

findings, however,[18] are not enough to require the remand Prost seeks. Other evidence, essentially unchallenged on appeal, provides a sound footing for the judge's findings as to the "priority" each parent gave to the care of the children. Most important is the testimony of the *au pair*, Stephanie Werner, who was perhaps the closest thing to a disinterested witness able to observe the family at close range for an extended length of time. The judge credited Werner's testimony about Prost's infrequent presence for dinner and absorption in her work even late in the evening,[19] evidence that corroborated the testimony of Greene himself, his sister, and (to the extent shown in the record) Larry Brown.[20] The judge cited concrete events demonstrating how Prost's "devotion to her job and/or her personal pursuits often takes precedence over her family."[21] By contrast, the judge heard testimony from Werner, as well as work associates of Greene, supporting a finding that he had "prioritized the care and well-being of his children, striking a delicate balance between parenthood and his career."[22]

In sum, the factual errors in the judge's recollection or understanding of the testimony did not deprive her decision of the required firm foundation in the record.

### D. The claimed physical assaults.

■ Prost's remaining contention, on the other hand, leaves us unable to affirm the custody determination outright. She argues that the trial judge failed to come to grips with the substantial evidence she presented that Greene had repeatedly assaulted her since late 1991. She maintains that the judge was required to take account of this evidence in light of D.C.Code § 16–914(a)(5) ("the mental ... health of all individuals involved") and, more importantly, in light of the recent amendment of § 914(a) by the Council of the District of Columbia making "evidence of an 'intrafamily offense' " an express factor to be considered in the custody determination.[23] As Prost concedes, this amendment does not apply directly to this case, *see Edwards v. Lateef,* 558 A.2d 1144, 1146–47 (D.C.1989) (general nonretroactivity of statutory changes affecting substantive rights), but Prost argues that the legisla-

---

**18.** Prost points out that as evidence of Greene's close involvement in Matthew's kindergarten schooling the judge cited testimony of the kindergarten teacher for the year in question, but ignored other portions of that testimony lauding Prost's equally attentive involvement in Matthew's education.

**19.** Some *amici* argue that the judge clearly erred in crediting this testimony because, they say, Werner testified that she was still in the house by the children's 7:30–9:30 p.m. bedtime *only twice* during her stay with the family. *Amici* rely on one interpretation of a discrete portion of Werner's testimony; viewing her testimony as a whole the judge could fairly infer that she was regularly home late enough to observe Prost's late evening work habits.

**20.** Brown testified that over the years he would frequently come to Washington, and would have dinner or stay overnight at the Prost–Greene home two to seven times a year. The judge further noted that Gary Palmquist, a witness for Prost, conceded possibly having said that "he 'doesn't know why [Prost] had kids, she never spends time with them.' "

**21.** The judge noted testimony, for example, that at the time Greene "set-up and ran" Matthew's birthday party in 1991, Prost, though physically present, " 'was doing a huge pile of work, and

didn't join in the activities at all.... She worked the entire time—several hours—[while defendant] ran all the activities.' " See also *supra,* note 4.

**22.** The judge took note of the "virtually 7 days a week" Greene had worked while at Council 20, but credited his testimony that a substantial amount of this work was done at home late in the evening, after Matthew had gone to bed. Greene nonetheless testified that the excessive work hours were one reason he had left Council 20.

**23.** See *supra,* note 8. An "intrafamily offense" is defined as "an act punishable as a criminal offense committed by an offender upon a person ... to whom the offender is related by ... marriage...." D.C.Code §§ 16–1001(5), –1001(5)(a) (Supp. I 1994). Assault or threatened assault, of course, is a criminal offense. D.C.Code § 22–504 (1989). Under the amendment to § 914(a), which became effective August 25, 1994 (three days after the trial judge's denial of Prost's motion to alter or amend judgment), if the trial judge finds by a preponderance of the evidence that a party seeking custody has committed an intrafamily offense, the judge must specify in writing factors and findings that support any grant of custody or visitation to the abusive parent. D.C.Law 10–154, 41 D.C.Reg. 6839 (Sept. 16, 1994) (codified at D.C.Code § 16–914(a–1)).

ture's contemporaneous judgment about the critical link between domestic violence and custodial fitness underscores the inadequacy of the judge's treatment of the claimed assaults.

Prost presented testimony by herself and others on this point. She testified, in summary, that

in late 1991 Greene grabbed her arms, pushed her, and threw dishes at her; in early 1992, he pushed her onto the bed, choked her, and screamed at her; in the late summer of 1992, he stepped on and pressed his weight down on her right foot, threatening to make her left foot, which had been permanently injured in an accident, "look good" compared to her right foot; in October 1992, in the incident that impelled her to flee the house and seek a CPO, he poked her in the chest and pushed her back against the bed while screaming, "I'm going to fuck you.... I'm going to tear ... apart ... every aspect of your existence"; and after October 24 he again pushed her.

According to Prost, three of these incidents took place in the presence of one or both children. Ann Labelle testified that in July 1992 she saw bruises on Prost's arm, and that in August 1992 she saw bruises on the top and bottom of Prost's foot. Jackie Young testified that in mid–1992 she saw Prost "kind of hobbling" and that Prost's foot "was bruised and swollen." Stephanie Werner confirmed that on one occasion Prost, who apparently was then unaware of Werner's presence, screamed at Greene, "Come on. Hit me. Hit me. Are you going to hit me again?"

The trial judge took note of this evidence, setting forth five instances of the alleged assaults and pointing out that Greene denied each allegation. But the judge's remaining discussion of the issue was as follows:

Plaintiff never filed a police report but, after the October 24 incident, on the advice of counsel, she obtained a Temporary Protection Order (TPO) that, *inter alia*, grant-

ed her temporary custody of the children. Thereafter, although defendant steadfastly denied all of plaintiff's allegations, he repeatedly consented to extensions of the TPO while the parties tried to work things out between them. But their efforts were unavailing and, ultimately, they entered into a succession of Consent Orders continuing the TPO and establishing visitation rights for defendant.

All of those orders are long expired and no such provisions should any longer be necessary. These two adults will have to learn to be civil to each other, for the sake of their own, as well as their children's, emotional health, and to respect what will now be their separate property rights— neither entering the other's residence without permission.

This treatment of the issue is unsatisfactory. It leaves unresolved whether all or any of the acts occurred, and thus their relevance to factors that the judge herself considered important to the custody decision. Independently of the Council's recent action, the relevance of violence between spouses to the issue of fitness to assume custody is well-recognized. *See, e.g., In re M.D.*, 602 A.2d 109, 113 (D.C.1992) (in child neglect proceedings, where mother asserted threats and harassment by father but latter disputed these, trial judge failed to "reach[ ] an independent legal conclusion based on factual findings in light of the evidence before him").[24] Evidence of such assaults reflects upon the character and emotional control ("the mental ... health") of a spouse, and thus bears directly upon the record support for the judge's finding that Prost was "much more emotionally volatile and unstable than [Greene]." It is also relevant to a factor that, as discussed earlier, the judge considered paramount in this case: the basic respect one spouse has for the other, and hence that spouse's anticipated willingness to allow the other spouse generous involvement in the children's lives. In this regard, we recall, the judge attached substantial weight to the

---

**24.** See also, for example, *McCurry v. McCurry*, 223 Ga. 334, 155 S.E.2d 378, 380 (1967); *In re Marriage of Snyder*, 241 N.W.2d 733, 734 (Iowa 1976); *Collins v. Collins*, 171 W.Va. 126, 297

S.E.2d 901, 902–03 (1982). And see, THE IMPACT OF DOMESTIC VIOLENCE ON CHILDREN: A REPORT TO THE PRESIDENT OF THE AMERICAN BAR ASSOCIATION (1994).

character "trait[s]" Prost had shown in verbally abusing Greene about his unemployment [25] and displaying what Greene aptly terms a proprietary attitude toward the children in resisting Greene's exercise of his recent visitation rights. Greene's own asserted violent conduct would seem self-evidently relevant to this evaluation.

In order to consider the bearing of the claimed assaults on the custody determination, the judge must deal with their truth or falsity and with the attendant circumstances more explicitly than she did. Greene argues that the judge implicitly rejected these allegations as "unsubstantiated," but we read the judge's cryptic treatment of them instead as essentially laying aside a chapter in the parties' turbulent relationship now closed by their final separation, though still demonstrating a need for them "to learn to be civil to each other." The heightened importance of proof of physical abuse,[26] and its relevance to issues central to the decision of who should be entrusted with the primary care of these children, requires more careful consideration of the evidence on this point.

### E. Conclusion

 Therefore, we remand the case to the trial judge for further findings and conclusions as to the alleged intrafamily assaults.[27] Whether additional testimony is called for on this point rests, of course, within the discretion of the trial judge. In the event the judge adheres to her ultimate determination of who should receive custody, the judge shall enter a new judgment, and Prost may pursue whatever additional relief from this court she considers appropriate. In all other respects,[28] we find no ground for setting aside the trial judge's determination.

*So ordered.*

SCHWELB, Associate Judge, concurring:

I agree with the remand and with most of the court's opinion. I write separately, however, because I think the determination whether spousal abuse occurred in this case has considerable significance for reasons which the majority opinion does not address, but which might affect the disposition of the case on remand. The judge should decide who is lying, on this and on at least one other issue, for a good deal could turn on the answer.

This is a case in which the wife testified unequivocally that the husband physically assaulted and abused her on several occasions, some of them in the presence of the boys. The husband testified that he did not do it, period. The two versions cannot be reconciled. Both parties were under oath. At least one of them is not telling the truth. There were other issues on which the parties' accounts diverged, but this one is probably the starkest.

As the majority points out, there was a good deal of corroboration by other witnesses for the wife's claims of physical assault. If what she alleged really happened, then the

25. Prost "denied that [Greene's] depression [subsequent to his decision to quit Council 20] was a problem insisting that if he got a job he would not be depressed. She immediately 'began hounding' her husband to get a new job, continually criticized him for not engaging in a sufficiently active job search, and repeatedly berated him, calling him a parasite and a sponge ..." (footnote omitted).

26. Greene, while denying that any of the alleged assaults took place, does not attempt to dismiss them as mere roughness or name-calling. He did testify that on one occasion Prost picked up a piece of wood spiked with nails and threatened to strike him with it; and on another occasion threw an object at him. On remand, of course, the trial judge is free to consider any such conduct by Prost as well.

27. We reject altogether Prost's suggestion on brief that any remand should be to a different judge. Respected counsel for Prost left no doubt at oral argument of his conviction that Judge Taylor would deal objectively with any remaining questions in this litigation.

28. The judge did not abuse her discretion in ruling that the award to Greene of a share of Prost's pension benefits included benefits accruing through the date of divorce rather than only those accruing through the date of separation. *See Barbour v. Barbour,* 464 A.2d 915, 917–18, 922 (D.C.1983); *McCree v. McCree,* 464 A.2d 922, 924–25 & n. 2 (D.C.1983). And the judge did not abuse her discretion in concluding that Prost had no equitable interest in Greene's townhouse acquired before the marriage. *See Sanders v. Sanders,* 602 A.2d 663, 666 (D.C.1992); *Brice v. Brice,* 411 A.2d 340, 344 (D.C.1980); *Mumma v. Mumma,* 280 A.2d 73, 76 (D.C.1971).

husband not only engaged in extremely culpable conduct, but also perjured himself by denying it. Although this court alluded laconically in *Coles v. Coles*, 204 A.2d 330, 331–32 (D.C.1964) to the prevalence in divorce litigation of a "tolerable amount of perjury," see maj. op. at 625, I do not believe that this characterization was meant to be taken literally, or that lying under oath has become more or less acceptable. If the trial judge finds that the husband both assaulted his wife in front of his children and perjured himself on the subject, I do not see how she could fairly exclude such findings from the custody calculus.

There is other troubling evidence of deceptive conduct in this record. In a letter dated June 1, 1992 to his friend and then-attorney, the husband referred to the wife as a "slimey [sic], sleazey [sic], vile and disgusting leech." At trial, he introduced into evidence as an exhibit a doctored version of the letter with the disagreeable language excised. Also missing from the husband's exhibit was a statement in the original letter that because the husband had anticipated that the wife would demand proof of payment before reimbursing him for certain expenditures, "I made up a false payment record for May." The apparent chicanery was revealed on cross-examination, when counsel for the wife produced the undoctored letter.

The judge made no findings regarding this curious incident, in which the husband appeared to have contrived to deceive the court by conjuring away parts of a document which placed him in an unfavorable light.[1] The husband also effectively admitted in the original letter that he had obtained or attempted to obtain money from the wife by false pretenses.

Professor Wigmore has written, and this court has recognized, that

[i]t has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *false-hood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) (emphasis added to last sentence only), quoted in *Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991).

In my opinion, the husband's conduct in altering the letter (as well as the fabricated payment which he acknowledged in its original version) constituted the very kind of deception with which Dean Wigmore was concerned. But there may be more here than consciousness of guilt which "operates indefinitely, though strongly, against the whole mass of alleged facts constituting his cause." The husband comes across in this incident, at least in his dealings with the wife, as a deceptive and dishonorable man. If he also lied under oath about the assaults on his wife in front of the children, then in my view the judge should give further careful consideration to the question whether it is in the children's interest that he, rather than the wife, be their custodial parent. I do not suggest that such a finding would compel an award to the wife, but I do think that a fundamental lack of probity, if established, has to be treated as an important factor in the equation.[2] The husband is apparently a good deal more relaxed and smoother than the wife is in handling the boys. But especially in this kind of case, in which the future

---

1. The husband testified that he sent a second letter at a later date, backdating it to June 1, because his lawyer "mentioned to me that it was probably not a good idea ... even kidding like that...." The reader can draw his or her own conclusion as to whether the purged language constituted an attempt at humor.

2. This proposition would come into play, of course, only if one spouse was significantly more truthful than the other.

of the children is in the balance, character counts too.